UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL TROMAN, MITCHELL FEDER,
AHMED SHAKIR, STACEY MORIATES,
LEELA MARET, JANEK PATEL, JOSEPH
MIRAGLIA, and JOHN READE,

                              *Plaintiffs*,

                    -v-

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,

                              *Defendant*.

16-CV-6948 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge:

This case concerns the efforts of union officers elected to the Executive Committee of the

Civil Service Technical Guild, also known as Local 375 ("Local 375") to enjoin its parent union,

the American Federation of State, County, and Municipal Employees ("AFSCME"), and its

International President Lee Saunders ("Saunders") from enforcing an administratorship imposed

on August 29, 2016. On October 13, 2016, this Court denied Plaintiffs' motion for a temporary

restraining order and preliminary injunction, holding that they had not demonstrated a likelihood

of success on the merits and had not properly exhausted their intra-union remedies. *Troman v.*

*Am. Fed'n of State, Cty. & Mun. Emps.*, No. 16 Civ. 6948, 2016 WL 5940924 (S.D.N.Y. Oct. 13,

2016).

On October 24, 2016, Plaintiffs amended their complaint to reflect the October 4, 2016,

decision of AFSCME's Administratorship Hearing Board upholding the imposition of the

administratorship, and to add several causes of action under the Labor Management Reporting

and Disclosure Act of 1959 ("LMRDA"). (Dkt. No. 50.) On November 16, 2016, AFSCME

moved for summary judgment on all claims, contending that it complied with its international

constitution, that the LMRDA does not apply to Plaintiffs' claims, and that Plaintiffs failed to

properly exhaust their intra-union remedies. (Dkt. No. 58.) For the reasons that follow,

AFSCME's motion is granted.[1]

## I.     Background

The following material facts are uncontested unless otherwise noted.

AFSCME is a national labor organization that represents more than 1.6 million members.

(Dkt. No. 63 ¶ 1.) Lee Saunders is the International President of AFSCME, and has held this

position since 2012. (*Id.* ¶ 2.) Local 375 is an affiliated local union chartered by AFSCME that

represents over 7,000 skilled technical employees who work for New York City, its various

agencies, and other municipal entities. (*Id.* ¶¶ 4–5.) Aside from members of its own staff, Local

375 represents exclusively public employees. (*Id.* ¶ 6.)

AFSCME and its affiliates are governed by a written constitution that sets forth the

substantive and procedural rights and obligations that apply to the labor organizations under

AFSCME's umbrella and their members. (*Id.* ¶ 3.) Numerous provisions of this constitution are

relevant to the present dispute.

The AFSCME Constitution opens with a "bill of rights for union members." (Dkt. No.

21-5.) As relevant here, this "bill of rights" guarantees members "the right to fair and

democratic elections, at all levels of the union," which includes "equal opportunity for

competing candidates, and proper election procedures which shall be constitutionally specified."

(*Id.* at 8.) It also guarantees members "the right to full participation, through discussion and

---

[1] Because the Court grants AFSCME's motion on the substantive grounds that AFSCME has not
violated the LMRA and that the LMRDA does not apply to Plaintiffs, it does not reach the
question whether Plaintiffs properly exhausted their intra-union remedies.

vote, in the decisionmaking processes of the union, and to pertinent information needed for the exercise of this right." (*Id.* at 9.)

The AFSCME Constitution also provides the International President with the authority to impose an administratorship on a subordinate body in specifically enumerated circumstances. Local 375 is considered to be a "subordinate body" for the purposes of this dispute, pursuant to Article IX, Section 1 (Dkt. No. 21-3 at 69–70), and Article XII, Section 4 of the AFSCME Constitution (Dkt. No. 21-4 at 131). The International President's authority is provided by Article IX, Section 37, which, as relevant here, empowers him to place a subordinate body under administratorship pending notice and hearing if he finds that such body "is acting in violation of this Constitution or of any lawful order of the Convention, the International Executive Board, or the International President, so that in the opinion of the International President an emergency situation exists." (Dkt. No. 21-3 at 103.)

Article IX, Sections 39 through 42 provide for an internal procedure that commences "immediately" upon the International President's taking of any action under Article IX, Section 37. (*Id.* at 104.) Section 39 requires the Chairperson of AFSCME's Judicial Panel to appoint an Administratorship Hearing Board of no more than three members from among the members of the Panel, and places responsibility on the Chairperson to make hearing arrangements and provide adequate notice to affected parties. (*Id.*) Section 40 requires the Administratorship Hearing Board to hold a hearing "as soon as is consistent with due process," with a minimum of seven days' advance notice and not later than 21 days after the imposition of the administratorship. (*Id.* at 104–05.) Section 40 also guarantees "[a]ll interested parties . . . a fair opportunity to present their views on the matter." (*Id.* at 105.) Section 41 requires the Administratorship Hearing Board to decide the matter "as expeditiously as possible," and

Section 42 states that the Board has the power to vacate the International President's decision. (*Id.*) Section 42 further grants both the International President and the affected local the right to appeal the Board's decision to the International Executive Board. (*Id.*) This body generally meets quarterly. (Dkt. No. 21 ¶ 27.)

Article XI of the AFSCME Constitution discusses the composition and functions of the Judicial Panel. The Judicial Panel is composed of nine members who are selected by the International President and the International Executive Board for three-year terms. (Dkt. No. 21 ¶ 23.) The members of the Judicial Panel are from different parts of the country, and no member of the Judicial Panel may participate in any case arising from a local of which that member is or was a member. (*Id.*)

### A.    Local 375 Election History and the Imposition of the Administratorship

While the allegations of dysfunction within Local 375 have a longer history, the catalyst for the imposition of the administratorship in this case was a series of election protests beginning in December 2015. That election was largely held between two slates of candidates: the "Claude Fort Slate," representing the longstanding incumbent president of Local 375, and the "New Directions Slate," to which the Plaintiffs in this case belonged. (Dkt No. 61-1 at 16–19.) The New Directions Slate, which lost the first round of the elections, brought a challenge alleging various irregularities. A hearing was held on February 1, 2016, and the Judicial Panel rendered a decision on February 24, 2016. (Dkt. No. 21-6 ("February Decision").)

In the February Decision, the Judicial Panel determined that various slates had improperly used union resources for campaign purposes. (*Id.* at 6.) Specifically, email domains owned by one of Local 375's chapters were used to disseminate campaign material. (*Id.*) The Panel also found that campaign emails had been sent to City of New York work emails, held that

"direct or indirect use of employer resources, equipment and supplies, during a union campaign is improper and not allowed," and clarified that this included employer email. (*Id.*) While the Panel determined that a "substantial majority" of the offending emails supported the slate of then-incumbent President Claude Fort, it also found that "a significant number of emails . . . were sent to work emails . . . which supported other slates or which attacked the Claude Fort Slate." (*Id.* at 4.) Finally, the Panel determined that the Fort slate had improperly used a union newsletter to publish articles critical of two members running in opposition to his slate. (*Id.* at 10.)

In response to these findings, the Judicial Panel vacated the results of the December 2015 elections, cancelled the scheduled run-off, and directed a new election of all Local 375 officers supervised by the International Union. (*Id.* at 15.)

A new election was conducted in May 2016; this time, the New Directions Slate won a narrow victory. Aggrieved members of the Claude Fort Slate filed an election challenge with the Judicial Panel, a hearing was held on July 7, 2016, and a preliminary decision was issued on August 12, 2016. (Dkt. No. 21-2 ("August Decision"); *see also* Dkt. No. 21 ¶¶ 10–11.))

In the August Decision, the Judicial Panel found "unequivocal evidence that dozens of improper campaign emails were again sent to the City of New York addresses of Local 375 members . . . by or on behalf of both the 'Team Claude Fort' slate and the 'New Direction' slate running for office." (Dkt. No. 21-2 at 3.) The Panel noted that the February Decision was "absolutely clear" that any further violations would lead to the vacating of the election results, and that "there was a presumption by the undersigned, which has obviously proven to be unfounded, that based on that decision—which is a lawful order of the Judicial Panel—there would be no improper emails by any slate or candidates . . . in the rerun of the election." (*Id.*)

The Panel emphasized once more that "both major slates of candidates [were] responsible for such action." (*Id.* at 4.) The Panel also found a secondary violation when a chapter president denied incumbent president Claude Fort the right to speak at a meeting where two of the challengers were permitted to speak, and noted that "these actions clearly undermine[d] the right of members to hear all sides of the election debate, and goes [sic] to the very core of union democracy." (*Id.* at 7–8.)

The Panel concluded that it had heard "evidence of the continued complete disregard for AFSCME's Election Code" and that "the evidence established that the conduct which violated the Election Code . . . did not abate after the initial election, and if anything, has become ingrained in Local 375. The total disregard of the Election Code and the [February Decision] has seriously undermined the members' rights to a free and fair election." (*Id.* at 10.) Accordingly, the Panel concluded that "ordering a new election . . . would continue what appears to be a now endless spiral of ignoring AFSCME's Election Code and would further the dysfunction now evident in this Local Union" and referred the case over to President Saunders for investigation. (*Id.* at 11.)

On August 29, 2016, Saunders sent a series of letters to each of Local 375's election union officers, advising them of his decision to impose an administratorship in response to the referral from the Judicial Panel. (*See* Dkt. No. 21-1.) The letters stated:

> On August 12, 2016, the Judicial Panel forwarded to this office its preliminary decision in Case No. 16-64-Local 375 Election Protest. I have reviewed the issues presented in that case, as well as the Judicial Panel's findings. I am of the opinion that the conduct that occurred is a continuation of a pattern demonstrated through numerous other Judicial Panel decisions, such that I find the existence of an emergency situation in [Local 375]. Specifically, I am of the opinion that the local is acting in violation of the International Constitution by its repeated engagement of conduct that violates several provisions of the Bill of Rights for Union Members, including their right to fair and democratic elections and their right to full participation in the decision making processes

of the union.  I am further of the opinion that such conduct cannot or will not
be immediately remedied by the local.  Therefore, in accordance with Article
IX, Section 37 of the International Constitution, I am placing Local 375 under
administratorship, pending notice and hearing, effective immediately.

(*Id.*)  President Saunders appointed AFSCME's Area Field Services Director, John English, to

serve as the Administrator of Local 375, and immediately suspended all of the local's elected

officers.  (*Id.*)

### B.     The Administratorship Hearing Board Proceedings

In accordance with Article IX, Sections 39 and 40 of the AFSCME Constitution, the

matter was referred for a hearing before the Administratorship Hearing Board.  (Dkt. No. 21

¶ 22.)  On September 1, 2016, notice was provided to the Plaintiffs informing them that the

hearing would take place on September 16, 2016.  (Dkt. No. 21-9.)  The notice stated that the

subject of the hearing would be Saunders's imposition of the administratorship, provided the

name of the hearing board chair, and indicated that all interested parties would be given a fair

opportunity to present their views on the matter.  (*Id.*)

The hearing was held as scheduled on September 16, 2016, before a three-person panel.

(Dkt. No. 61-1 at 2.)  AFSCME appeared represented by associate general counsel Nicole

Pollard, while Plaintiffs appeared without counsel.  (*Id.*)  Ms. Pollard declared that Saunders's

decision was "not about the conduct of one individual and . . . not about the conduct that only

occurred in the last few months.  This administratorship is about a local union so engrained in

dysfunction, conflict and self-serving interest that the fundamental rights of its 7,500 members

are blatantly and repeatedly ignored." (*Id.* at 15.)  In addition to the conduct described in the

February and August Judicial Panel Decisions, she noted that, while elections were held every

three years, for the last two decades the candidates for office have generally consisted of the

same individuals, and infighting had led to a "litany of cases filed with the AFSCME Judicial

Panel" and "a long history of institutional behavior that ignores established rules and dismisses decisions made by the membership and their elected representatives." (*Id.* at 15–16.)

The first witness called by AFSCME was Elizabeth Perrow, who had been assistant to the Judicial Panel chairperson for 28 years. (*Id.* at 24.) She noted that between 2001 and 2016, ninety-six cases involving Local 375 were decided at the trial level by the Judicial Panel. (*Id.* at 29.) Sixty-nine of these cases involved internal union charges and twenty-seven involved challenges to elections. (*Id.* at 30.) Perrow stated that this number of cases represented "[a]bsolutely many, many more from [Local] 375 than any other local I can think of in AFSCME," and that it could be up to "three times as many" cases. (*Id.* at 33.) Mr. Troman and Ms. Moriates, the charging parties in the proceeding and two of the Plaintiffs in this case, were offered the opportunity to, and actually did, cross-examine Perrow. (*Id.* at 35–41.)

The second witness called was John English, the administrator who was appointed to head Local 375 by Saunders. After reviewing the history of the electoral dispute within Local 375, English characterized the situation that prevailed in executive committee meetings that he had attended, calling them "chaotic" and "dysfunctional." (*Id.* at 60.) He opined that it had become "routine for folks to just ignore binding decisions made by governing bodies, be it the delegate body or the executive committee . . . [thus] nullifying the will of the members through the democratic process." (*Id.* at 64.) English stated that he fully supported the administratorship, and alleged that $135,000 of members' dues money had been spent on two flawed elections that had failed to produce an untainted leadership. (*Id.* at 78–79.) Mr. Troman and Ms. Moriates cross-examined English as well. On cross-examination, English admitted that the problems allegedly plaguing Local 375 were not the exclusive product of the Troman slate's time in power, but had existed in various manifestations for "a long period of time." (*Id.* at 94.)

After the presentation of AFSCME's two witnesses and several union members who spoke in favor of the administratorship, a variety of witnesses who opposed the administratorship were heard. Mitchell Feder, one of the Plaintiffs in this case, argued principally that Saunders was improperly holding the current union administration responsible for the wrongdoings of their predecessors, that there was no emergency, and that union business was otherwise proceeding as normal. (*Id.* at 147–49, 55.) Thomas Constantine, who had served as treasurer under various slates, noted that it was typical for email to be used for electioneering and that Local 375 members were able to freely exercise their votes. (*Id.* at 189.) Ahmed Shakir, Stacey Moriates, and Janek Patel, all Plaintiffs in this case, also testified against the administratorship, and emphasized that no administratorship had been imposed in the past when, in their view, the local was experiencing far greater disorder. (*Id.* at 202–38.)

## C. Administrative Hearing Board and Judicial Panel Decisions

On October 4, 2016, the Administrative Hearing Board rendered a decision unanimously affirming Saunders's decision to impose the administratorship. (Dkt. No. 61-5.) After summarizing the February and August decisions of the Judicial Panel concerning the local's election conduct and the hearing testimony, the Board agreed that Local 375 had engaged in a pattern of conduct that violated members' rights to fair and democratic elections and full participation in the decisionmaking process. (*Id.* at 12.) The Board found that Saunders's decision was based on a pattern of conduct and not on any one member's alleged misconduct, including the conduct of former president Claude Fort or any specific acts that occurred after the May 2016 election. (*Id.* at 13.) The Board emphasized that both sides had engaged in email-related misconduct in defiance of the February Decision of the Judicial Panel, and that at the hearing, Ahmed Shakir had admitted that the New Directions slate "[had] to reply back to the

members whatever [Claude Fort] is writing wrong about us," thereby demonstrating a "lack of self-control" and a "disregard for rules and procedures when it serves a self-interest." (*Id.* at 13–15 (alteration in original).)

The Board also cited over a dozen Judicial Panel decisions concerning Local 375 that, in its view, demonstrated the "unwillingness of those in leadership positions to protect the rights of the membership when it serves their self-interests." (*Id.* at 17.) Accordingly, because "[t]hose who were in office at the time the administratorship was imposed cannot distance themselves from this conduct or behavior as the evidence shows that many of them were directly involved," the Board sustained Saunders's finding that the local union's failures "constitute[d] an emergency situation and an appropriate basis for an administratorship." (*Id.* at 18.) On October 11, 2016, the Judicial Panel subsequently issued a supplemental decision to the August Decision, upholding the election challenges made by the Claude Fort slate, vacating the results of the May 2016 elections, and vesting discretion in the Local 375 Administrator to determine when to conduct elections. (Dkt. No. 61-7 at 10–11.)

Finally, although the parties have not brought this to the Court's attention, the Court notes that on December 16, 2016, AFSCME's International Executive Board considered the imposition of the administratorship over Local 375, and unanimously upheld the decision. *See* AFSCME Local 375 Administratorship Appeal Response Letter (Dec. 19, 2016), http://civilservicetechnicalguild.org/content/afscme-local-375-administratorship-appeal-response-letter (last visited June 7, 2017).

## II.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006). Then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* at 273. "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

III.    **Discussion**

A.    **Claims under Labor Management Reporting and Disclosure Act (LMRDA)**

Plaintiffs' second and third causes of action—the Court deals with the first cause of action below—assert claims under 29 U.S.C. § 462 and § 464(c), provisions of LMRDA that limit the permissible purposes for which trusteeships[2] can be established by parent unions over their subordinate bodies and ensure that trusteeships are imposed only in accordance with the parent unions' constitutions and bylaws.[3]  Because Plaintiffs argue that the LMRDA should be applied to their claim that AFSCME violated its own Constitution, which the Court has already taken jurisdiction over pursuant to 29 U.S.C. § 185(a), *see Troman*, 2016 WL 5940924 at *3–4, the Court must first address whether LMRDA applies to Plaintiffs at all.

The LMRDA's provisions generally do not apply to labor organizations that exclusively represent public employees.  The Act defines "employee" as "any individual employed by an employer," and "employer" to exclude "the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof."  29 U.S.C.

---

[2]    Title III of the LMRDA uses the word "trusteeship" to describe a parent union's intervention in one of its local affiliates, whereas the AFSCME Constitution refers to "administratorships."  The LMRDA defines "trusteeship" as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws," 29 U.S.C. § 402(h), which would clearly include the administratorship at issue here.  The Court will refer to "trusteeships" when discussing the LMRDA because this is the term utilized by the statute and the case law, but clarifies that the difference is purely semantic.

[3]    Specifically, 29 U.S.C. § 462 enumerates the limited purposes for which trusteeships are appropriate as "correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."  29 U.S.C. § 464(c) states that a trusteeship established in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing is to be presumed valid for 18 months absent "clear and convincing proof" that it was not established or maintained in good faith for a permissible purpose.

§ 402(e)–(f).  It further defines "labor organization" as an entity "in which employees participate" and "which exists for the purpose . . . of dealing with employers . . . ."  29 U.S.C. § 402(i).  Because the City of New York and its agencies are political subdivisions of New York State and therefore not "employers" under 29 U.S.C. § 402(f), their employees are not "employees" for the purpose of 29 U.S.C. § 402(e).  Accordingly, Local 375 does not qualify as a "labor organization," because it does not have the participation of "employees" or deal with "employers" as those terms are defined by statute.  (*See* Dkt. No. 63 ¶ 6 (barring members of its own staff, Local 375 represents exclusively public employees).)

Title III of LMRDA, which governs trusteeships, provides jurisdiction over claims by "any member or subordinate body of a labor organization" to "bring a civil action in any district court of the United States having jurisdiction of the labor organization."  29 U.S.C. § 464(a).  The Act does not define "subordinate body," and the Second Circuit has not had occasion to explicitly rule on the term's meaning in a published decision.  Every Circuit that has addressed the issue, however, has held that a "subordinate body" must also be a "labor organization" within the meaning of the Act to benefit from Title III's protections on trusteeships.  *See, e.g.*, *Smith v. Office & Prof'l Emps. Int'l Union*, 821 F.2d 355, 356 (6th Cir. 1987) (analyzing the Act's structure and legislative history and finding that "Congress in Title III . . . clearly used the term 'subordinate body' interchangeably with the terms 'labor organization' and 'subordinate labor organization'"); *Kanawha Valley Labor Council v. Am. Fed'n of Labor & Cong. Of Indus. Orgs.*, 667 F.2d 436, 437–38 (4th Cir. 1981) (considering "the LMRDA's language, structure, and legislative history" and holding that a union of public employees could not be a "subordinate body" because it was not a "labor organization"); *N.J. Cty. & Mun. Council No. 61 v. Am. Fed'n of State, Cty. & Mun. Emps.*, 478 F.2d 1156, 1160 (3d Cir. 1973) ("The only conclusion which

we can reasonably reach is that public employee unions are not covered by the phrase 'subordinate body' . . . .").

These decisions are persuasive and this Court adopts their reasoning in full. As the Sixth Circuit has noted, the term "subordinate body" appears in only one of LMRDA's six titles; by virtue of the definition of "labor organization," public sector employees are clearly excluded from the protections of Titles I, II, IV, V, and VI. *Smith*, 821 F.2d at 356. In Title III itself, 29 U.S.C. § 463(a) repeatedly uses the terms "subordinate body" and "labor organization" to refer to the same entity, and 29 U.S.C. § 461, which establishes reporting requirements for trusteeships, uses the term "subordinate labor organization." *Id.* Simply put, there are no indications, either textually or in the legislative history examined by the courts, that Congress had any intent to extend LMRDA protections to subordinate bodies composed of public employees.

Plaintiffs argue, however, that they may bring the suit against AFSCME under 29 U.S.C. § 412, which provides that "[a]ny person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief . . . as may be appropriate." (Dkt. No. 64 at 19.) This argument is without merit; this section is found in Title I of LMRDA, codified at 29 U.S.C. §§ 411–15, and is not relevant to suits concerning trusteeships under Title III. Plaintiffs' invocation of their membership in AFSCME as a basis for standing to pursue their claims is similarly unavailing; the issue is not that Plaintiffs lack standing to invoke LMRDA, but rather that the Act's substantive protections are not available for public sector unions such as Local 375.

Accordingly, because the LMRDA does not apply to AFSCME's actions in imposing the administratorship at issue in this case, the Court grants AFSCME's motion for summary judgment on Plaintiffs' second and third causes of action.

**B.      LMRA § 301(a) Claim under AFSCME's Constitution**

**1.      Legal Standard**

Plaintiffs' first cause of action alleges that AFSCME imposed an administratorship on Local 375 for reasons not permitted by the AFSCME Constitution.  This cause of action arises under Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a), which allows for "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations, [to] be brought in any district court of the United States."  The Supreme Court has held that a parent union's constitution is a contract "between labor organizations" that is enforceable in federal court under Section 301.  *United Ass'n of Journeymen v. Local 334,* 452 U.S. 615, 627 (1981).  Accordingly, if, after applying the proper deference to internal union decisionmaking, this Court concludes that a genuine dispute of material fact exists as to whether AFSCME and Saunders violated the AFSCME Constitution in imposing the administratorship, it must deny Defendant's motion for summary judgment.

As a preliminary matter, Plaintiffs argue that, because the applicable law in § 301(a) suits is federal law, "which the Courts must fashion from the policy of our national labor laws," *Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 456 (1957), the Court should look to the substantive standards of the LMRDA in shaping LMRA Section 301's law about trusteeships. (Dkt. No. 64 at 11.)  The Court sees no basis for this novel contention.

Allowing a public sector local to invoke the LMRDA—when its rights under the constitution between the local and its parent are enforceable under LMRA § 301(a)—would render meaningless the exclusion of public sector unions from the LMRDA's definition of "labor organizations." While Plaintiffs may object to AFSCME's argument that "one set of rules apply to trusteeships over private-sector unions and another over public-sector unions," (Dkt. No. 64 at 15), that is indeed the state of the law. *See Smith*, 821 F.2d at 356 ("While it is contended that this holding allows unions covered by the Act to impose abusive trusteeships over locals not covered, we believe that amendment to correct such abuses must come from Congress, rather than being judicially engrafted by a strained reading of the statute.").

Moreover, the Court need not search far to find the proper federal law to apply to a LMRA § 301(a) case involving the interpretation of a union constitution; it is well established that Plaintiffs must show that Saunders's interpretation of the AFSCME Constitution "was unreasonable or that [Saunders] acted in bad faith." *Ass'n of Contracting Plumbers v. Local Union No. 2*, 676 F. Supp. 523, 530 (S.D.N.Y. 1988).

When considering the reasonableness of Saunders's interpretation of the AFSCME Constitution, the Court must apply a deferential standard, and avoid any urge to "rush into what [are] essentially . . . matter[s] of internal union governance." *Int'l Bhd. of Teamsters v. Local Union No. 810*, 19 F.3d 786, 788 (2d Cir. 1994). The law in this Circuit is that courts "defer to the Union's interpretation of its governing documents unless that interpretation is 'patently unreasonable.'" *Sim v. N.Y. Mailers' Union No. 6*, 166 F.3d 465, 470 (2d Cir. 1999) (quoting *Newell v. Int'l Bhd. of Elec. Workers*, 789 F.2d 1186, 1189 (5th Cir. 1986)); *see also Mason Tenders Local Union 59 v. Laborers' Int'l Union*, 924 F. Supp. 528, 544–45 (S.D.N.Y. 1996), *aff'd*, 101 F.3d 686 (2d Cir. 1996) (requiring showing that union's interpretation was "patently

unreasonable" as a predicate to court intervention); *Ass'n of Contracting Plumbers*, 676 F. Supp. at 530 ("The question is not 'the ultimately correct interpretation' of the [union's] constitution but whether the [union's] interpretation is 'patently unreasonable.'") (citing *Local 334 v. United Ass'n of Journeymen & Apprentices*, 669 F.2d 129, 131 (3d Cir. 1982)).

If the Court finds that Saunders's decision to impose an administratorship was not patently unreasonable, it may still act to block it if it determines that he acted in bad faith. *See Local Union 810*, 19 F.3d at 794 ((stating that for a finding of bad faith, the president's actions "would need to be prompted not by some honest mistake as to his duty . . . 'but by some interested or sinister motive.'") (quoting *Black's Law Dictionary* 176 (4th ed. 1968)); *Local No. 48 v. United Bhd. of Carpenters & Joiners,* 920 F.2d 1047, 1054–55 (1st Cir. 1990) ("[A] union's action, though arguably authorized by, and not patently unreasonable under, its governing documents, may still be blocked by the courts if undertaken in bad faith. . . . [B]ad faith . . . can be found on evidence that union officials acted contrary to the International's best interests, out of self-interest, or in an unconscionable or outrageous way."); *Mason Tenders Local Union 59*, 924 F. Supp. at 547–48 ("The Second Circuit . . . [has] instructed that the inquiry into bad faith should be employed where there is evidence that a union official had a 'sinister motive' or intent to benefit personally, such as some pecuniary gain.").

Accordingly, in order for AFSCME to be entitled to summary judgment on Plaintiffs' claims under LMRA § 301(a) and the AFSCME Constitution, it must demonstrate that there is no genuine dispute of material fact (1) as to whether Saunders's decision to impose an administratorship on Local 375 was a patently unreasonable interpretation of Article IX, Section 37 of the AFSCME Constitution and (2) as to whether Saunders acted in bad faith.

### 2.     Discussion

Article IX, Section 37 empowers President Saunders to place a subordinate body, such as Local 375, under administratorship pending notice and hearing if he finds that "a subordinate body is acting in violation of this Constitution or of any lawful order of the Convention, the International Executive Board, or the International President, so that in the opinion of the International President an emergency situation exists."  (Dkt. No. 21-3 at 103.)  On August 29, 2016, following a referral from the Judicial Panel which found Local 375 to be in a "now endless spiral of ignoring AFSCME's Election Code," (Dkt. No. 21-2 at 11), Saunders made such a finding, citing "a pattern demonstrated through numerous other Judicial Panel decisions" that the local had "repeated[ly] engag[ed in] conduct that violates several provisions of the Bill of Rights for Union Members, including their right to fair and democratic elections and their right to full participation in the decision making processes of the union," and that "such conduct cannot or will not be immediately remedied by the local."  (Dkt. No. 21-1.)  For the following reasons, the Court concludes that it is beyond genuine dispute that Saunders's interpretation of Article IX, Section 37 of the AFSCME constitution was not patently unreasonable or imposed in bad faith and that Plaintiffs received a fair hearing.

### a.     Reasonableness

On the substance, Plaintiffs make several arguments that Saunders's determination was unreasonable.  First, they contend that there was no evidence that Local 375, as opposed to individual officers of Local 375, had acted in a manner that violated the AFSCME Constitution. (Dkt. No. 64 at 13.)  Second, they argue that prior AFSCME decisions to impose administratorships in other locals occurred only in more drastic circumstances, such as wholesale inactivity, corruption, or threatened secession from the parent union, while Local 375 was still

fulfilling all of its key functions unabated.  (*Id.* at 7.)  They note that there was high turnout—

over 35%—for the election, which compared favorably to other AFSCME locals and may have

been the "largest participation of any AFSCME local in New York."  (*Id.* at 8.)  Third, they note

that in Local 375's own history, there were a number of serious events during which AFSCME

chose not impose a trusteeship, including ballot stealing and corruption.  (*Id.*)  Finally, they

argue that much of the alleged misconduct was attributable to the prior local president Claude

Fort, who had held power for most of the last 15 years, and that it was undemocratic for

AFSCME to act only when "the Local members finally decided to move on and install a new

group."  (*Id.* at 9.)  Plaintiffs contend that the above factors demonstrate that Saunders's

determination that an "emergency situation" existed—the requisite finding necessary to impose

the administratorship pursuant to Article IX, Section 37—was patently unreasonable.

     In the union context, the Second Circuit has defined emergency as "an unforeseen

combination of circumstances or the resulting state that calls for immediate action."  *Local

Union No. 810*, 19 F.3d at 793 (citing Webster's Collegiate Dictionary (9th ed. 1989)).

Therefore, for an emergency administratorship to have properly been imposed, Saunders "must

have had a good faith belief that a situation within the local was developing suddenly and

unexpectedly or through an unforeseen combination of circumstances."  *Id.*

     Applying the deferential approach to internal union affairs that federal labor policy

requires, the Court concludes that Saunders's determination that an "emergency situation"

existed was well within his discretion and was not patently unreasonable.  Despite Local 375's

history of infighting and conflict, Saunders could not have foreseen that, after a valid election

challenge resulting in the programming of a new election managed by the International Union,

both slates of candidates would continue to participate in exactly the same conduct that led to the

election results being vacated in the first place.  And, of course, once these new developments came to his attention, he was not required to act within a vacuum, but was rather fully entitled to consider Local 375's history, which included a "pattern of dysfunction" of local officers failing to follow the AFSCME Constitution.  (*See* Dkt. No. 21 ¶¶ 13–14.)

Plaintiffs' argument that the AFSCME Constitution allows for the finding of an emergency situation only upon the actions of Local 375 itself, as opposed to individual officers of the Local, is unavailing.  Local 375 operates through its members and officers, and in this case, where the record demonstrates that both the longstanding incumbents and the challengers in the election violated the Judicial Panel's instructions on election conduct, it was not unreasonable for Saunders to find that such conduct was pervasive enough to infect the Local as a whole.

While Plaintiffs, who were recently elected to office after replacing a longstanding incumbent, may believe that that it is "unfair" that an administratorship was imposed shortly after their slate took office and not during earlier periods where they allege that the Local's violations of the AFSCME Constitution were more blatant, or may argue that Local 375 compares favorably to other locals where administratorships were imposed, such claims are beyond the Court's purview, which is limited to determining whether Saunders's interpretation of the AFSCME Constitution was patently unreasonable.  It was not.  Accordingly, the Court turns to whether Saunders's imposition of the trusteeship was done in bad faith.

### b.      Bad Faith

Though Plaintiffs invoke "bad faith" in their briefing, they have made no colorable argument that Saunders acted from an "interested or sinister motive," "out of self-interest, or in an unconscionable or outrageous way."  *See Local Union 810*, 19 F.3d at 794.   Plaintiffs have

made no allegations that Saunders or any other AFSCME official had a corrupt motive in imposing the administratorship or removing Plaintiffs from their union officer positions. While Plaintiffs imply that Saunders's actions either directly benefited former president Claude Fort or that a double standard was applied as between AFSCME's treatment of Mr. Fort and the Plaintiffs in this case, this is belied by the undisputed fact that the February Decision of the Judicial Panel, which was the triggering event of this controversy, upheld the challenge brought by Plaintiffs and nullified Mr. Fort's election.

Finally, on May 11, 2017, Plaintiffs submitted a supplemental affirmation appending several Judicial Panel decisions concerning AFSCME locals in Wisconsin and Pennsylvania that appear to indicate that sending emails to work addresses did not violate the AFSCME election rules. (Dkt. No. 73.) Plaintiffs argue that, because "the basic grounds for overturning two Local 375 elections . . . has not been found to violate AFSCME's Election Rules or Bill of Rights in the past . . . [t]his raises a fact issue of good faith[.]" (*Id.* ¶ 4.) They are incorrect. The Court does not have jurisdiction to act as a reviewing tribunal to ensure consistency among a union's internal decisions, which may have arisen in disparate factual circumstances. It is uncontested that Plaintiffs were aware of the specific Judicial Panel decision that applied to their local—the February Decision—and were found to have disregarded its directives. The existence of other decisions pertaining to other locals that have reached other conclusions does not raise a genuine dispute of material fact about the good faith of Saunders's decision to impose the administratorship, which is the relevant question before the Court.

### c.    Procedural Concerns

In addition to their substantive objections to AFSCME's administratorship, Plaintiffs raise procedural concerns about the fairness of the September 16, 2016 proceedings before the

Administratorship Hearing Board.  (Dkt. No. 64 at 16–19.)  They allege a panoply of procedural violations, including that the hearing notice gave no information other than the date and time of the hearing, that the officers had no access to the Local's records, that the officers were denied union funds to pay for counsel, that the hearing's procedure and scope were undefined, and that the Judicial Panel was biased both because it was appointed by a chairperson who had already found Local 375 to be "dysfunctional" and because it was composed of members who were all appointed by Saunders.  (*Id.* at 10, 16.)

This Court has already held that, assuming *arguendo* that the LMRDA's "minimum fair hearing requirement of notice and an opportunity to defend" apply, *Becker v. Indus. Union of Marine & Shipbuilding Workers*, 900 F.2d 761, 768 (4th Cir. 1990), such requirement was met in this case.  *See Troman*, 2016 WL 5940924 at *7 n.2 (concluding that notice was sufficient where each Plaintiff was given explicit notice that the hearing would concern the propriety of the administratorship, and where Plaintiffs failed to show that their counsel was excluded from the hearing).

Although the Court has held that the LMRDA does not apply in this case, a close reading of the Act's legislative history "confirms Congress' recognition that at common law a trusteeship would ordinarily be set aside 'unless the local [was] given a fair hearing including notice of the charges and an opportunity to defend.'"  *Becker*, 900 F.2d at 768 (quoting H.R. Rep. No. 741, at 13 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318); *Plentty v. Laborers' Int'l Union*, 302 F. Supp. 332, 338 (E.D. Pa. 1969) ("[U]nder the common law prior to the passage of the [LMRDA] a trusteeship imposed upon a subordinate body was invalid unless the subordinate body was granted a fair hearing.").

Even assuming without deciding that public sector locals not subject to the LMRDA are still entitled to basic common law procedural protections, the Court concludes once again that these requirements have been met. All Plaintiffs were provided with timely notice informing them of the subject of the hearing as well as Saunders's letter removing them from their positions and setting forth the basis for the administratorship, and all had access to the prior Judicial Panel decisions that triggered the controversy. On this record, the lack of a detailed enumeration of charges on the notice itself cannot plausibly be said to have prejudiced the Plaintiffs in putting on their case. At the hearing itself, Plaintiffs and their witnesses were clearly aware of the nature of the controversy and the rationale for Saunders's decision. Five witnesses were permitted to testify at length regarding their opposition to the administratorship, and Plaintiffs Troman and Moriates were permitted to, and actually did, cross-examine the witnesses supporting its imposition.

Accordingly, the Court concludes that the undisputed facts establish beyond genuine dispute that Plaintiffs were granted a fair hearing on the administratorship.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. Plaintiffs' cross-motion for summary judgment is DENIED. The Clerk of Court is directed to close Dkt. No. 58, and to close the case.

SO ORDERED.

DATED:     July 6, 2017
           New York, New York

                                        _____
                                        J. PAUL OETKEN
                                        United States District Judge